## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KELLY NOVO,
    *Plaintiff*,

   v.

CITY OF DANBURY, DAVID
PARDOVICH, CHRISTOPHER RINK, ERIC
CIEPLY, and PATRICK RIDENHOUR
    *Defendants.*

No. 3:18-cv-907 (VAB)

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Kelly Novo ("Plaintiff") has sued the City of Danbury ("Danbury") and four members of the Danbury Police Department, Officer David Pardovich, Officer Eric Cieply, Officer Christopher Rink, and Chief of Police Patrick Ridenhour (collectively, the "Defendants"). Notice of Removal, ECF No. 1 ¶ 1 (May 30, 2018) ("Not. of Removal"); Second Am. Compl., ECF No. 38 at 1–2 (June 12, 2020).

Ms. Novo claims that Officer Pardovich, Officer Cieply, and Officer Rink unlawfully entered her home and, in the process of placing her under arrest, caused her physical injury. Am. Compl. at 2–5. She brings claims against Officer Pardovich, Officer Cieply, and Officer Rink for common law negligence and recklessness, *id.* at 3–5, violations of Article First, §§ 7, 8, and 9 of the Connecticut Constitution, and violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983, *id.* at 7–8. She brings claims against Chief Ridenhour for negligent supervision. *Id.* at 5–7. Finally, she brings claims against Danbury for indemnification under Conn. Gen. Stat. § 52-577n, *id.* at 5, and for failure to supervise and train its police officers under 42 U.S.C. § 1983, *id.* at 8–9.

1

Defendants have moved for summary judgment as to all claims.

For the following reasons, Defendants' motion for summary judgment is **GRANTED.**

The federal claims are dismissed, and given the lack of jurisdiction over the remaining state law claims, this case will be remanded back to the Connecticut Superior Court for the Judicial District of Danbury.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

On December 20, 2016, Danbury Police were called to Ms. Novo's residence at 14 Fleetwood Drive two separate times. Pl.'s L. R. 56(a)(2) Statement of Material Facts in Opp'n to Defs.' Mot. for Summ. J. ¶ 1, ECF No. 34-1 (Jan. 16, 2020) ("Pl.'s SMF"). The parties agree that the first occasion arose from a reported domestic disturbance. *Id.* ¶ 2; Defs.' L. R. 56(a)(2) Statement of Material Facts ¶ 2, ECF No. 31-2 (Dec. 13, 2019) ("Defs.' SMF"). Ms. Novo, however, denies that a reported domestic disturbance led to the second interaction with Danbury Police. Pl.'s SMF ¶ 2.

At the time of the first disturbance, Ms. Novo's daughter, Courtney Kichline, resided at the same address with her minor son. *Id.* ¶ 2.

On that first occasion, Ms. Novo and Ms. Kichline had an "argument . . . acrimonious enough that their respective boyfriends felt it necessary, at one point, to physically separate the two women." *Id.* ¶¶ 2–3 (admitting paragraph 3 "as stated," but disputing Ms. Kichline's deposition testimony). Ms. Kichline called Danbury police for assistance with removing her son's belongings from the home. *Id.* ¶ 4. Ms. Kichline removed some of her belongings and left the home with her boyfriend without further incident. *Id.* ¶ 5. Ms. Novo alleges that Officer Pardovich instructed Ms. Kichline that she would need to return to the home the following day to

finish moving in order to avoid another incident with Ms. Novo. Pl.'s Additional Statement of Material Facts ¶¶ 2–3, ECF No. 34-1 at 6 (Jan. 16, 2020) ("Pl.'s Add'l SMF"). Ms. Kichline moved out of the home that night. *Id.* ¶ 3.

Ms. Kichline returned to the property later that evening. Pl.'s SMF ¶ 6. According to Ms. Nova, Ms. Kichline's original intention was to "sneak into the back door and get her laptop," Pl.'s Add'l SMF ¶ 4, but Ms. Kichline said she saw Ms. Novo and her sister destroying Ms. Kichline's personal property inside the home, Pl.'s SMF ¶ 6. Consequently, Ms. Kichline called Danbury Police a second time, claiming that her mother was destroying her property. *Id.* Ms. Novo denies that any property was destroyed. *Id.*; Pl.'s Add'l SMF ¶ 6. Ms. Kichline later admitted at her deposition that her statement to the police—that her mother was destroying her property—was a lie. Pl.'s Add'l SMF ¶ 6 (citing Kichline Dep., ECF No. 31-8 at 20:16–23 (Nov. 14, 2018)).

Officers Pardovich and Cieply responded to this call, met with Ms. Kichline outside, and approached the front door. Pl.'s SMF ¶ 7. The officers knocked on the front door, at which time Ms. Novo answered, told them they could not enter the premises without a search warrant, and closed the door. *Id.* ¶ 8. Officers Pardovich and Cieply summoned Officer Rink (collectively, "the Officers"), a supervisor, to the scene. *Id.* Before Officer Rink arrived, Ms. Kichline told Officers Pardovich and Cieply she had a key to the residence and invited them inside. *Id.* ¶ 9.

Ms. Kichline, Officer Pardovich, and Officer Cieply entered the home through a door adjacent to the kitchen. *Id.* ¶ 10. When Ms. Novo saw Ms. Kichline, she began "us[ing] obscenities and jumped over a child safety gate." *Id.* Defendants claim that "Ms. Novo reached Ms. Kichline and made physical contact with her, requiring the officers and Ms. Novo's boyfriend to physically separate them." Def.'s SMF ¶ 11. In contrast, Ms. Novo claims that

neither she "nor Ms. Kichline describe physical contact in their deposition testimony." Pl.'s SMF ¶ 11. Ms. Novo concedes having consumed alcohol and yelling obscenities at Ms. Kichline that evening, *id.* ¶¶ 12–13, and that other parties present—Ms. Kichline, her boyfriend, Carlo Juliano, and Ms. Novo's other daughter, Hayley—"all perceived Plaintiff to have been intoxicated," Def.'s SMF ¶ 12.

Ms. Novo further admits that she "refused to comply with [the Officers'] instructions," but alleges that those instructions were unlawful. Pl.'s SMF ¶ 14. In addition to jumping over a child safety gate and approaching Ms. Kichline, Ms. Novo also admits needing to be "restrained" by her boyfriend, Mr. Coelho. *Id.* ¶ 15.

The police officers instructed Ms. Novo to calm down, but she refused to comply. *Id.* ¶¶ 16–17. Ms. Novo denies that the officers warned her that she would risk arrest if she failed to comply and denies that they instructed her to return to the living room until Ms. Kichline collected her belongings. *Id.* ¶ 16. Although admitting to "yell[ing] obscenities in [their] presence," Ms. Novo denies that she was "mouthing off" to the police officers. *Id.* ¶¶ 16–17.

At that point, Officer Rink and Officer Pardovich "approached [Ms. Novo], indicating that she was under arrest." *Id.* ¶ 18. Defendants claim that Ms. Novo "failed to comply with their attempt to handcuff her," so Officer Rink and Officer Pardovich each took hold of one of her arms. Def.'s SMF ¶ 19. Ms. Novo admits that Officer Cieply never came into physical contact with her. Pl.'s SMF ¶ 19. Ms. Novo then was escorted outside to Officer Cieply's waiting cruiser, and was transported to the Danbury Police Station without further incident. *Id.* ¶ 20.

Ms. Novo alleges that the Danbury Police Department policy entitled the "General Order for Family Violence" governs these events. Pl.'s Add'l SMF ¶ 1.

4

### B.  Procedural History

On May 7, 2018, Ms. Novo filed this lawsuit against Defendants in Connecticut Superior Court. Compl., ECF No. 1-1 at 4 (May 7, 2018).

On May 30, 2018, Defendants removed the case to this Court under 28 U.S.C. § 1331, because of the existence of a federal question. Not. of Removal.

On September 19, 2018, Defendants moved to dismiss Counts Three, Five, and Six of the Complaint for failure to state a claim upon which relief could be granted. Defs.' Mot. to Dismiss, ECF No. 16 (Sept. 19, 2018); Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 16 at 3–15 (Sept. 19, 2018).

On October 23, 2018, Ms. Novo filed her brief in opposition to Defendants' motion to dismiss. Pl.'s Opp'n to Defs.' Mot. to Dismiss, ECF No. 19 (Oct. 23, 2018).

On March 13, 2019, Ms. Novo moved for leave to file an amended complaint in order to remove her claim for emotional distress damages. Mot. for Leave to File Am. Compl, ECF No. 20 (Mar. 13, 2019).

On July 12, 2019, the Court granted in part and denied in part Defendants' motion to dismiss, and denied without prejudice Ms. Novo's request to file an amended complaint. Order, ECF No. 25 (July 12, 2019).

On August 13, 2019, Ms. Novo filed an Amended Complaint. Am. Compl., ECF No. 26 (Aug. 13, 2019).

On September 12, 2019, Defendants filed their Answer to the Amended Complaint. Answer, ECF No. 27 (Sept. 12, 2019).

On October 14, 2019, Ms. Novo moved to correct a scrivener's error in her Amended Complaint. Second Mot. to Amend/Correct Compl., ECF No. 29 (Oct. 14, 2019).

On November 6, 2019, Defendants filed their Amended Answer to the Second Amended Complaint. Am. Answer, ECF No. 30 (Nov. 6, 2019).

On December 13, 2019, Defendants moved for summary judgment on all of Ms. Novo's claims. Defs.' Mot. for Summ. J., ECF No. 31 (Dec. 13, 2019) ("Defs.' Mot."); Defs.' Mem. in Supp. of Defs.' Mot., ECF No. 31-1 (Dec. 13, 2019) ("Defs.' Mem.").

On January 16, 2020, Ms. Novo opposed Defendants' motion for summary judgment. Pl.'s Opp'n to Defs.' Mot., ECF No. 34 (Jan. 16, 2020) ("Pl.'s Opp'n").

On January 30, 2020, Defendants filed their reply. Defs.' Reply to Pl.'s Opp'n, ECF No. 35 (Jan. 30, 2020) ("Defs.' Reply").

On June 8, 2020, the Court granted Ms. Novo's motion to correct a scrivener's error in her Amended Complaint. Order, ECF No. 37 (June 8, 2020).

On June 12, 2020, Ms. Novo filed her Second Amended Complaint. Second Am. Compl.

On August 4, 2020, the Court held a telephonic hearing on the motion for summary judgment. Minute Entry, ECF No. 41 (Aug. 4, 2020).

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d

Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

Defendants assert that the Court should grant summary judgment in their favor because there are no genuine issues of material fact with respect to each of Ms. Novo's claims and they are entitled to judgment as a matter of law. Alternatively, they argue that the claims should be dismissed under the doctrine of qualified immunity.

The Court first will address the federal claims, and then, if necessary, state law claims.

### A. The Fourth Amendment Claims Under 42 U.S.C. § 1983

Section 1983 provides a private right of action against state officials for constitutional violations:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations and citation omitted).

Ms. Novo alleges warrantless entry and the use of excessive force in violation of the

8

Fourth Amendment of the U.S. Constitution. Am. Compl. at 7–9. The alleged warrantless entry

occurred when Officers Pardovich, Cieply, and Rink entered the premises at 14 Fleetwood Drive

with the use of Ms. Kichline's key, but without Ms. Novo's consent. Pl.'s SMF ¶¶ 1, 7–10. The

alleged use of excessive force occurred during Ms. Novo's arrest when Officer Pardovich and

Officer Rink took hold of her arms and attempted to handcuff her. *Id.* ¶¶ 18–19.

Defendants argue that they are entitled to summary judgment because they did not violate

any of Ms. Novo's rights, and, alternatively, that they are protected by qualified immunity.

Defs.' Mot. at 1–2.

### 1. The Fourth Amendment Warrantless Entry Claim

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

Amend. IV; *see Terry v. Ohio*, 392 U.S. 1, 9 (1968) ("[W]hat the Constitution forbids is not all

searches and seizures, but unreasonably searches and seizures." (internal quotations and citation

omitted)). "Whether a search is reasonable is determined by assessing, on the one hand, the

degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it

is needed for the promotion of legitimate governmental interests." *United States v. Massey*, 461

F.3d 177, 178 (2d Cir. 2006) (internal quotation marks omitted).

It is well settled that a search conducted "without a warrant issued upon probable cause is

per se unreasonable . . . subject only to a few specifically established and well-delineated

exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and

citations omitted).

Defendants argue that they did not violate Ms. Novo's Fourth Amendment rights because they had consent from Ms. Kichline, a resident, to enter 14 Fleetwood Drive.[1] Defs.' Mem. at 13. Defendants concede that Ms. Novo refused to allow them entry into her home before Ms. Kichline used her key to let them in. *Id.* They argue, however, that, although Ms. Novo could object to their entry over the permission of Ms. Kichline, she could not prevent them from entering the premises. *Id.* Defendants emphasize that they had already responded to a domestic disturbance between mother and daughter earlier that day and that when Ms. Kichline called for assistance on the second occasion, she told police that Ms. Novo was in the process of destroying her personal property. *Id.* at 14. Consequently, Defendants argue that their actions were reasonable, and fell "squarely within the guidelines of what the Supreme Court found permissible . . . ." *Id.* (citation omitted). Defendants further argue that they are entitled to qualified immunity. *Id.* at 8.

In response, Ms. Novo asserts that "it is disputed that Ms. Kichline was a resident of the home at the time she authorized the police to enter." Pl.'s Opp'n at 8. Ms. Novo argues that, "although Ms. Kichline had a property interest in those items she left behind earlier in the evening, she no longer had a legal interest in the home or authority to enter the same," because she had already moved out of the home. *Id.* at 8–9. In Ms. Novo's view, Ms. Kichline "lacked legal access to the home even if she had physical access through use of a key." *Id.* at 9. Ms. Novo further argues that "Officer Pardovich knew that to be the case because he was there to oversee her moving her items out of the residence." *Id.* at 8. Ms. Novo contends that, even assuming Ms. Kichline was a resident of the home, Defendants cannot succeed because "[t]he police in this instance reintroduced [Ms. Kichline] into the home . . . [and] created the domestic

---

[1] Ms. Kichline possessed a key to the premises, *see* Defs.' Mem. at 19, and the parties agree that Ms. Kichline used her key to allow the Officers to enter the premises, Pl.'s SMF ¶ 9.

disturbance that led to [Ms. Novo's] arrest." *Id.* at 10. According to Ms. Novo, the Officers "endangered [her], Ms. Kichline, and themselves, by entering the home after consent was denied," and further violated her constitutional rights by arresting her for "her predictable reaction to their violation of her Constitutional rights." *Id.* at 11–12.

In reply, Defendants argue that Ms. Novo fails to address their qualified immunity argument "in any meaningful fashion." Defs. 'Reply at 1. Defendants further argue that Ms. Novo's argument against Ms. Kichline's residency status must fail because Ms. Kichline "had resided in the home for many years; she and her son each had bedrooms therein, containing substantial belongings, and she had a key." *Id.* at 1–2.

The Court agrees.

Under the Fourth Amendment caselaw, an exception to the requirements of both a warrant and probable cause occurs when a search is conducted with the consent of an occupant of the premises. *Davis v. U.S.*, 328 U.S. 582, 593–94 (1946). Consent must be "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248.

In *United States v. Matlock*, the Supreme Court held that, in situations where multiple co-inhabitants have joint access and control of the property, "any of the co-inhabitants has the right to permit inspection" of the property. *U.S. v. Matlock*, 415 U.S. 164, 165–66 (1974). Under the *Matlock* rule, permission to search the premises may be shown by proof that "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171. A person's common authority to consent to a search is "not to be implied from the mere property interest a third party has in the property" but rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-

inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

In *Georgia v. Randolph*, the Supreme Court defined one such exception: "when law enforcement officers conduct a search, authorized by one co-occupant, over the express objection of another co-occupant, any further search would be unreasonable as to the objecting co-occupant." *U.S. v. Lopez*, 547 F.3d 397, 399 (2d Cir. 2008) (citing *Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006)).

A third party is authorized to consent to a search of a home if that person "has access to the area searched" and either "(a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area." *Moore v. Andreno*, 505 F.3d 203, 208–09 (2d Cir. 2007) (citing *U.S. v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992); *U.S. v. Gradowski*, 502 F.2d 563, 564 (2d Cir. 1974)). "[N]o case in this circuit has delimited the requisite 'access' necessary to satisfy the first prong of the *Davis* test." *Moore*, 505 F.3d at 210.

Here, the access element is satisfied because Ms. Kichline had access to a key to the residence. *See* Pl.'s SMF ¶ 9 (admitting that "[s]ubsequent to Officer Rink's arrival, Ms. Kichline indicated that she had her key to the residence, and invited the Officers inside"). Thus, the issue before the Court is whether Ms. Kichline had "common authority" over the residence.

Factors to consider for whether a third party has "common authority over an area" include:

> (1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings such as a diary or a pet at

> residence; (8) performing household chores at that residence; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the residence when the owner is not present.

*Wheelings v. Iacuone*, No. 3:14-cv-00526 (CSH), 2015 WL 5306602, at *6 (D. Conn. Sept. 10, 2015) (citing *Moore*, 505 F.3d at 209 n.6).

Although certain undisputed facts indicate that Ms. Kichline had common authority over the area—she had a key and resided there with her minor, Pl.'s SMF ¶¶ 2, 9—Ms. Novo also alleges that Ms. Kichline had no ownership interest and thus no substantial interest in the home, Pl.'s Opp'n at 9, and that she moved out of the home that night, Pl.'s SMF ¶ 3. Indeed, Ms. Kichline called the Danbury police "for assistance in removing her son's belongings from the home." Def.'s SMF ¶ 3. Consequently, a reasonable jury could find that Ms. Kichline did not have common authority over the residence and thus had no actual or apparent authority to consent to the Officers entering the home, particularly not over Ms. Novo's prior objection.

Accordingly, the Court will not grant summary judgment on this claim.

### 2.   The Issue of Qualified Immunity on the Warrantless Entry Claim

Even if a reasonable jury could find that the police officers violated Ms. Novo's Fourth Amendment rights by entering her home without a warrant or the requisite consent, however, Defendants may still be entitled to summary judgment on qualified immunity grounds. *See generally Gonzalez v. City of Schenectady,* 728 F.3d 149, 158 (2d Cir. 2013) (affirming district court's summary judgment ruling that, though defendants arrested plaintiff without probable cause and conducted an unreasonable search under the Fourth Amendment, defendants were nevertheless entitled to summary judgment on qualified immunity grounds).

"Qualified immunity protects federal and state officials from money damages and unnecessary and burdensome discovery or trial proceedings." *Coollick v. Hughes*, 699 F.3d 211,

219 (2d Cir. 2012) (citing *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)) (internal quotation marks omitted); *see also Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) ("Qualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." (internal quotation marks omitted)). It "is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Coollick*, 699 F.3d at 219.

When a court analyzes the question of whether public officials are entitled to qualified immunity, there are two issues that guide the inquiry. *See Zalaski v. City of Hartford*, 723 F.3d 382, 388–89 (2d Cir. 2013). First, the court considers whether "the facts show that the officer's conduct violated plaintiff's constitutional rights." *Id.* Second, if the answer is no, "further inquiry is unnecessary because [ ] there is no viable constitutional claim," but if the answer is yes, "or at least not definitively no," the court may move on to the second question, "was the right clearly established at the time of defendant's actions?" *Id.*

Courts need not consider these two questions in order, and may consider the latter question first, which may be "particularly appropriate where the former turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct was not objectively unreasonable in light of existing law." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)) (internal quotation marks omitted). "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 555 U.S. at 243–44 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"[T]he clearly established right must be defined with specificity." *City of Escondido, Cal.*

*v. Emmons*, 149 S. Ct. 500, 501 (2019) (finding that defining the clearly established as "the right to be free of excessive force" was too general). It is a "constitutional right[ ] of which a reasonable person would have known" and "reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam) (internal citations and quotations omitted). "[S]pecificity is especially important in the Fourth Amendment context, where the [c]ourt has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). "For law to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarify to have placed the constitutional question at issue beyond debate." *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) (citing *Ashcroft v. al-Kidd*, 653 U.S. 731, 735 (2011)).

The issue here is whether the police officers reasonably believed that Ms. Kichline had authority to consent to their entry of the residence without a warrant. There is undisputed evidence that the Officers met with Ms. Kichline outside the residence after she reported that Ms. Novo was destroying her personal property; that they knocked on the front door and requested entry, to which Ms. Novo objected; and that Ms. Kichline had a key to the home and subsequently invited the Officers inside through an adjacent side door. Pl.'s SMF ¶¶ 6–10 (admitting the facts). Ms. Kichline also testified that she had lived at 14 Fleetwood Drive since she was four years old until December 20, 2016. Kichline Dep., ECF No. 31-8 at 2:12–24 (Nov. 14, 2018).

In addition, courts in the Second Circuit "also ask whether a police officer's objectively reasonable belief that he has obtained consent, even if in fact he has not, renders a search

constitutional." *Moore*, 505 F.3d at 209; *see also Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)

(holding that "determination of consent to enter must be judged against an objective standard"

and that search is constitutional when facts available to officer at the time would "warrant a man

of reasonable caution in the belief that the consenting party had authority over the premises"

(internal quotation marks omitted)). In other words, "[e]ven if the person giving consent in fact

lacked authority to do so, the consent may nonetheless validate the search if the person

reasonably appeared to the police to possess authority to consent to the search." *U.S. v. McGee*,

564 F.3d 136, 139 (2d Cir. 2009).

In this case, the undisputed facts of this case indicate that the police officers could

reasonably believe Ms. Kichline could consent to their entry of 14 Fleetwood Drive. "In

determining whether the agents' reliance on consent of a third party is reasonable, the rule 'is not

that they always be correct, but that they always be reasonable.'" *U.S. v. Wright*, No. 10-CR-504-

S-1 ADS, 2012 WL 1132421, at *3 (E.D.N.Y. Apr. 2, 2012) (quoting *Illinois v. Rodriguez*, 497

U.S. 177, 185 (1990)).

To the extent that Ms. Novo is arguing that the police officers should not have relied on

Ms. Kichline's authority to consent to their entrance after Ms. Novo had objected, there is no

clearly established law that would result in liability for the police officers at that level of

specificity. *See Emmons*, 149 S. Ct. at 501 ("[T]he clearly established right must be defined with

specificity."); *Muschette on Behalf of A.M. v. Gionfriddo*, 910 F.3d 65, 70 (2d Cir. 2019) ("To

determine whether the relevant law was clearly established, we consider the specificity with

which a right is defined, the existence of Supreme Court or Court of Appeals case law on the

subject, and the understanding of a reasonable officer in light of preexisting law." (citation and

internal quotation marks omitted)); *cf. McGee*, 564 F.3d at 138–41 (holding that defendant's

live-in girlfriend had actual authority to consent to search of defendant's residence even after

defendant took away her keys when she told him she planned on leaving him).

Accordingly, because the police officers are entitled to qualified immunity, Defendants

will be granted summary judgment on Ms. Novo's warrantless entry claim.

### 3.   The Excessive Force Claim Against Officers Pardovich and Rink

Claims for use of excessive force by police officers in the course of an arrest or other

seizure are considered under the reasonableness standard of the Fourth Amendment. *See Graham*

*v. Connor*, 490 U.S. 386, 394–95 & n.10 (1989) (claim that police officer used excessive force

against free citizen during an arrest was evaluated "under the Fourth Amendment and its

'reasonableness' standard" and not as a Fourteenth Amendment substantive due process claim).

To prevail on an excessive force claim, Ms. Novo must show that the amount of force used was

objectively unreasonable either as to when or how the force was applied, and that, as a result of

the use of force, she suffered some compensable injury. *Id.* at 396; *Maxwell v. City of N.Y.*, 380

F.3d 106, 108 (2d Cir. 2004).

Whether a given use of force is excessive depends on "the facts and circumstances of

each particular case, including the severity of the crime at issue, whether the suspect posed an

immediate threat to the safety of the officers or others, and whether [s]he is actively resisting

arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness '

of a particular use of force must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight" and must allow "for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Id.* at 396–97.

Here, the only use of force is by Officer Rink and Officer Pardovich, each grabbing one of Ms. Novo's arms in order to place handcuffs on her during her arrest. Pl.'s SMF ¶ 9; Defs.' SMF ¶ 9.

Defendants argue that, under the circumstances that existed at the time, "it was clearly reasonable for Officer Rink and Officer Pardovich to believe that taking hold of Plaintiff's arms and helping her to her feet was reasonably necessary to effectuate the arrest." Defs.' Mem. at 15. Regardless of whether or not Defendants violated a constitutional right, they argue that they are entitled to qualified immunity. *Id.* at 8, 15.

In response, Ms. Novo argues that use of force was unreasonable because Officer Rink and Officer Pardovich "forcefully lifted her from a seated position, violently twisted her, and wrestled her into the Christmas tree." Pl.'s Opp'n at 12. She also focuses on the police officers' gender, height and weight: both officers were male, stood at least six feet tall, and weighed no less than one hundred and eighty pounds. *Id.*

In reply, Defendants note that "Plaintiff does not address [their] qualified immunity claim[.]" Defs.' Reply at 1.

The Court agrees with Ms. Novo. Material factual disputes preclude summary judgment on her excessive force claim.

There is a genuine dispute of material fact as to what force was necessary for Officer Pardovich and Officer Rink to use during Ms. Novo's arrest and as to what force was actually used. *Compare* Pl.'s Opp'n at 12 (summarizing Ms. Novo's contention that she was sitting on her sofa when the officers "forcefully lifted her from a seated position, violently twisted her, and wrestled her into the Christmas tree"), *with* Defs.' Mem. at 8 (summarizing Defendants' contention that it was reasonable to take hold of each of Ms. Novo's arms to bring her to feet in

order to place handcuffs on her in the course of placing her under arrest). Because this is a fact-intensive inquiry, the determination of the objective reasonableness of the use of force used by Officer Rink and Officer Pardovich must be made by a jury. *See Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998) (finding that the question of whether the use of potentially deadly force was reasonable remained in dispute when two of the factors were contested).

Accordingly, the Court will not grant summary judgment on this claim.

### 4.  The Issue of Qualified Immunity on the Excessive Force Claim

But, even if a reasonable jury could find that Officer Rink and Officer Pardovich had violated Ms. Novo's Fourth Amendment rights and used excessive force, Officer Rink and Officer Pardovich still may be entitled to summary judgment under the doctrine of qualified immunity. As previously discussed, "[q]ualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Jones*, 465 F.3d at 55 (2d Cir. 2006) (internal quotation marks omitted).

Indeed, the use of force during an arrest is not necessarily unreasonable. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it[.]"). As a result, if "the circumstances are in dispute, and 'contrasting accounts . . . present factual issues as to the degree of force actually employed and its reasonableness,' a defendant is not entitled to a judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) (citing *Kerman v. City of N.Y.*, 261 F.3d 229, 239 (2d Cir. 2001)). The same standard applies to motions for summary judgment. *See Kramer v. City of Danbury*, No. 3:07-cv-01749 (DJS), 2010 WL 11661294, at *11 (D. Conn. Jan. 22, 2010) (denying a motion for

summary judgment when "whether the officers reasonably believed that the force utilized was reasonable turns more on whether the circumstances as they believed them to be warranted the use of force at all").

The prohibition of excessive force while effectuating an arrest is clearly established. *See Outlaw v. City of Hartford*, 884 F.3d 351, 364 (2d Cir. 2018) ("That the law prohibits excessive force when using force to make an arrest is neither a recent nor surprising development." (internal citations omitted)); *Mickle*, 287 F.3d at 122 (noting that it is "well established that the use of excessive force in the course of an arrest is constitutionally prohibited" (internal citations and quotation marks omitted)); *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("The Fourth Amendment protects against the use of excessive force by police officers in carrying out an arrest.").

The question here thus is whether the police officers reasonably used force in these circumstances. *See Muschette*, 910 F.3d at 70 ("An officer is entitled qualified immunity if '*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful.'" (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)) (emphasis in original)). And the answer is yes.

As a preliminary matter, "[n]either the Supreme Court nor the Second Circuit has established that a person has the particular right not to be handcuffed in the course of a particular arrest, even if [she] does not resist or attempt to flee." *Soares v. State of Conn.*, 8 F.3d 917, 922 (2d Cir. 1993). The Second Circuit, however, has declined "to adopt a *per se* rule that the use of handcuffs in effecting an arrest is always reasonable." *Id.* at 921. "[W]here an officer's use of force in handcuffing is plainly unreasonable under the circumstances or where a plaintiff manifests clear signs of her distress—verbally or otherwise—a fact finder may decide that the

officer reasonably should have known that his use of force was excessive for purposes of establishing a Fourth Amendment violation." *Cugini v. City of N.Y.*, 941 F.3d 604, 613 (2d Cir. 2019) (emphasis omitted). At the time of this arrest, it was clearly established in the Second Circuit that "it [is] a Fourth Amendment violation to use 'significant,' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety." *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 297 (S.D.N.Y. Aug. 21, 2014) (citations omitted).

Even accepting Ms. Novo's version at this stage of this proceedings, as this Court must, Ms. Novo had consumed alcohol at the time of her arrest, jumped over a child safety gate while running towards and yelling obscenities at Ms. Kichline, and refused to comply with the officer's instructions to "calm down." Pl.'s SMF ¶¶ 12–15; Defs.' SMF ¶¶ 12–15; *see also* Pardovich Dep., ECF No. 31-12 at 31:14–16 (May 10, 2019) ("When [Ms. Novo] grabbed on to [Ms. Kichline], that was deemed a domestic situation since she became physical with her daughter.").

As a result, it is undisputed that Ms. Novo was non-compliant.

Consequently, Ms. Novo has not shown that the police officers acted unreasonably when they grabbed her arms and attempted to handcuff her, as "reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury." *See Gonzalez v. City of N.Y.*, No. 98-cv-3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000) (citing *Hudson v. McMillian*, 503, U.S. 1, 7 (1992)). "Without additional allegations of excessive force or blatant disregard for pre-existing injuries, complaints, or requests for medical treatment, the use of handcuffs has been found to be reasonable." *Scott v. Cty. of Nassau*, No. 94-cv-4291, 1998 WL 874840, at *5 (E.D.N.Y. Dec. 11, 1998).

Here, although Ms. Novo claims to have experienced "extreme pain in her leg" when Officers Pardovich and Rink "grabbed ahold" of her and "pulled her to a standing position," Pl.'s

Add'l Facts ¶ 10, she has not alleged that these police officers knew she was injured, nor did she request medical attention, *see* Pardovich Dep. at 36:18–20 ("Q. Did she ever state to you that evening that she was suffering from any injuries? A. Not to me, no."); Rink Dep., ECF No. 34-3 at 41:22–25 (May 9, 2019) ("Q. Did she ever state to you that evening that she felt she experienced any injuries? A. In booking. So I don't recall her ever saying anything like that on scene[.]"). *See, e.g.*, *Ferrareso v. Town of Granby*, 646 F. Supp. 2d 296, 307–08 (D. Conn. 2009) (holding that officer's handcuffing of plaintiff was objectively reasonable because plaintiff did not complain of injuries or request medical attention at any time during interaction with officers and did not seek medical care for injury to left wrist and shoulder).

Furthermore, Ms. Novo has not established that it was a use of force that amounts to a constitutional violation. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment."). Ms. Novo also has not shown that the police officers violated a clearly established constitutional right. *See Cugini*, 941 F.3d at 616 (holding that the whether or not an officer's use of force while handcuffing and arresting an individual is entitled to qualified immunity must be must be "particularized to the facts of the case" (internal citations and quotation marks omitted)); *Soares*, 8 F.3d at 922 ("Neither the Supreme Court nor the Second Circuit has established that a person has the right not to be handcuffed in the course of a particular arrest, even if [she] does not resist or attempt to flee."); *see also Warner v. Gyle*, No. 3-09-cv-199 (RNC), 2010 WL 3925211, at *2 (D. Conn. Sept. 30, 2010) (holding that defendant failed to show that handcuffing plaintiff was reasonable under the circumstances but that defendant was still entitled to qualified immunity because decision to handcuff plaintiff did not violate a clearly established constitutional right).

Accordingly, because Officers Pardovich and Rink are entitled to qualified immunity,

Defendants will be granted qualified immunity as to Ms. Novo's excessive force claim.

### B.  The Municipal Liability Claim Against the City of Danbury

Municipalities are not vicariously liable in *respondeat superior* for the unconstitutional

misconduct of their officials and employees. *See Monell v. Dep't of Soc. Servs.*, 426 U.S. 658,

691–95 (1978). Municipal liability may be established, however, if a constitutional violation

occurred as a result of a policy, practice, or custom formally promulgated by the governing

authority of the municipality or the conduct of a person who had policymaking authority for the

municipality. *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) ("A

municipality is liable under section 1983 only if the deprivation of the plaintiff's rights under

federal law is caused by a governmental custom, policy, or usage of the municipality." (citing

*Monell*, 436 U.S. at 691)).

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability

under *Monell*" absent proof that "the incident . . . was caused by an existing, unconstitutional

municipal policy[] that can be attributed to a municipal policymaker." *City of Okla. City v.

Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion). A policy or custom may not be inferred

from an allegation that individual police officers have engaged in a single act of wrongdoing. *See

Henderson v. Town of Greenwich*, 317 F. App'x 46, 47 (2d Cir. 2009) ("[Plaintiff] argues

principally that the illegal stop itself establishes a genuine issue of fact as to a policy or custom.

But it does not[.]" (citing *City of Okla. City*, 471 U.S. at 823–24)).

Defendants argue that Ms. Novo's Complaint attempts to assert § 1983 claims against

Danbury "without complying with the requirements of *Monell*." Defs.' Mem. at 25. Although

Ms. Novo amended her original complaint to include an allegation that "the allegedly

unconstitutional acts were 'pursuant to a custom and policy'" of Danbury, Defendants assert that Ms. Novo has failed to allege facts that support that claim. *Id.* at 28. Defendants argue that Ms. Novo has broadly alleged that Danbury failed to supervise and train its officers but fails to allege any deficiencies in Danbury's police training programs and, thus, has failed to allege a direct causal link between Danbury's policy or custom and the alleged unconstitutional violation. *Id.* at 28–30. Furthermore, Defendants argue that Ms. Novo merely bases her allegations on a single incident of unconstitutional activity without alleging systemic constitutional violations by Danbury's police force in general. *Id.* at 30–31.

Ms. Novo argues that Danbury's General Order for Family Violence governs the alleged constitutional violations at issue and further argues that this policy fails to address situations such as the one alleged here because the policy "does not govern the decision of whether to re-enter a home to obtain additional property." Pl.'s Opp'n at 17. Alternatively, Ms. Novo argues that the police officers' actions "were so outside the bounds of reasonable conduct, that the policy does not even consider it as a possibility." *Id.* at 18.

The Court disagrees.

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis omitted). Because there was no underlying constitutional violation attributable to these police officers, the municipality of Danbury could not be held liable under *Monell*. *See, e.g.*, *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("The municipality cannot properly be held liable . . . unless the injury was inflicted by its lawmakers or by those whose edicts or acts may fairly be

said to represent official policy." (internal citations omitted)); *see also Segal*, 459 F.3d at 219

("Because the district court properly found no underlying constitutional violation, its decision

not to address the municipal defendants' liability under *Monell* was entirely correct.").

     In any event, there is nothing in this record suggesting a causal link between any training

or policy of the City of Danbury and this specific incident. *See, e.g.*, *Segal*, 459 F.3d at 219

("Even if these errors were the result of the Department's failure to train its investigators . . . ,

that failure has little to do with the theory of liability that she advances."). Indeed, Ms. Novo has

done nothing more than infer a custom based on this single incident. *See Jones v. Town of East*

*Haven*, 691 F.3d 72, 81–82 (2d Cir. 2012) ("[I]solated acts of excessive force by non-

policymaking municipal employees are generally not sufficient to demonstrate a municipal

custom, policy, or usage that would justify municipal liability. . . . The evidence failed to show a

pattern of abusive conduct . . . among officers, so widespread as to support an inference that it

must have been known and tolerated by superiors." (internal citations omitted)).

     Accordingly, the Court will grant summary judgment to Defendants and dismiss the

claim against the City of Danbury.

### C.  The State Law Claims

     Having dismissed all of Ms. Novo's federal claims, the Court declines to exercise

supplemental jurisdiction over her state law claims. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455

F.3d 118, 122 (2d Cir. 2006) ("a district court 'may decline to exercise supplemental

jurisdiction 'if it 'has dismissed all claims over which it has original jurisdiction'" (citing 28

U.S.C. § 1367(c)(3)); *Castellano v. Bd. of Trs.*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United*

*Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1991) ("[I]f the federal claims are dismissed before

trial . . . , the state claims should be dismissed as well."); *see also* 28 U.S.C. § 1367(c)(3) ("The

district courts may decline to exercise supplemental jurisdiction over a claim under subsection

(a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").

    In the absence of jurisdiction of Ms. Novo's claims arising under Article First, §§ 7, 8,

and 9 of the Connecticut Constitution, her claims for common law negligence, recklessness, and

negligent supervision, or her claim for indemnification against Danbury under Conn. Gen. Stat. §

52-577n, *see* Compl. at 5–9, this case will be remanded back to the Connecticut Superior Court.

*See* 28 U.S.C. §1447(c) ("If at any time before final judgment it appears that the district court

lacks subject matter jurisdiction, the case shall be remanded."); *see also Kolari*, 455 F.3d at

124 ("We have repeatedly held that a district court particularly abuses its discretion when it

retains jurisdiction over state-law claims raising unsettled questions of law following dismissal

of all original-jurisdiction claims."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 345 (1988)

("A federal district court has discretion under the doctrine of pendent jurisdiction to remand a

properly removed case to state court when all federal-law claims in the action have been

eliminated and only pendent state-law claims remain.").

**IV.  CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment.

The federal claims are dismissed, and given the lack of jurisdiction over the remaining state law claims, this case will be remanded back to the Connecticut Superior Court for the Judicial District of Danbury.

The Clerk of Court is directed respectfully to enter judgment for Defendants, remand this case back to the Connecticut Superior Court for the Judicial District of Danbury, and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of August, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE